**SEALED**
**BY ORDER OF THE COURT**

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

District of Hawaii

United States of America
v.

JEREMY KOSKI.

)
)
)
)
)
)
)

Case No.

Mag. No. 23- 00600 KJM

Defendant(s)

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII
Apr 24, 2023, 9:22 am
Lucy H. Carrillo, Clerk of Court

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____April 2020 to July 2020_____ in the county of _____Honolulu_____ in the _____ District of _____Hawaii & Elsewhere_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 USC § 1343 | Wire Fraud |
| 18 U.S.C. § 1957 | Money Laundering |

This criminal complaint is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

*Jasmin Gonzalez*
Complainant's signature

Jasmin Gonzalez, Special Agent, SBA-OIG
Printed name and title

Sworn to before me and signed in my presence.

Date: _____April 24, 2023 at 9:20 a.m._____

City and state: _____Honolulu, Hawaii_____

Kenneth J. Mansfield
United States Magistrate Judge

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Jasmin Gonzalez, being duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      This affidavit is made in support of the foregoing Criminal Complaint charging JEREMY KOSKI with Wire Fraud, in violation of 18 U.S.C. § 1343, and Money Laundering, in violation of 18 U.S.C. § 1957.  During the spring of 2020, KOSKI fraudulently obtained more than $737,000 in Paycheck Protection Program ("PPP") funds and Economic Injury Disaster Loan ("EIDL") funds in the names of companies he claimed to own. The loans were authorized by Congress in the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, P.L. 116-136, of March 2020, to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic through (sometimes forgivable) loans to small businesses for job retention and other specified expenses.

2.      I am a Special Agent with the U.S. Small Business Administration, Office of Inspector General ("SBA OIG") and have been so employed in this capacity since June 2019.  My duties as an SBA OIG Special Agent include the investigation of possible criminal violations of the Inspector General Act of 1978, as amended, specially, to provide independent and objective oversight to improve the integrity, accountability, and performance of SBA. I successfully completed the

Criminal Investigator Training Program at the Federal Law Enforcement Training
Center in Glynco, Georgia and the Inspector General Transitional Training
Program. My training included, but was not limited to, civil and administrative
remedies, grant fraud, contract fraud, program fraud and employee misconduct
investigations. and other related offenses.  Prior to becoming a Special Agent, I
was an intern with SBA OIG from June 2018 to May 2019.  I earned a Bachelor of
Science degree in Criminology from the University of La Verne and a Master of
Science degree in Homeland Security from San Diego State University.

      3.      In the course of my employment, I have conducted or assisted in
several criminal investigations of matters concerning bank fraud, wire fraud, fraud
in connection with major disaster and emergency benefits, and other unlawful
financial transactions.  The investigations have involved the use of electronic and
physical surveillance, the use of informants and cooperating witnesses and the
preparation and execution of search and arrest warrants. I have interviewed
witnesses, subjects and targets of investigations, and cooperating defendants.  I
have been assigned to work with the U.S. Department of Justice and other law
enforcement partners to investigate possible fraud associated with the stimulus and
economic assistance programs created by the federal government, to include the
SBA's PPP loan pursuant to the CARES Act, in response to the COVID-19
pandemic.

4.      The facts set forth in this affidavit are based upon my personal observations, knowledge, my training and experience, examination of documents and records, review of information contained in government databases, and information obtained from various law enforcement personnel and witnesses.

5.      The information in this affidavit is based on evidence obtained in the course of the investigation conducted by participating federal law enforcement agencies assigned to the United States Attorney's Financial Crimes Task Force. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## PROBABLE CAUSE

### *Overview of the Paycheck Protection Program*

6.      The CARES Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic.  One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and

3

certain other expenses, through a program referred to as the PPP. In or around

April 2020, Congress authorized over $300 billion in additional PPP funding.

7.     In order to obtain a PPP loan, a qualifying business must submit a PPP

loan application, which is signed by an authorized representative of the business.

The PPP loan application requires the business (through its authorized

representative) to acknowledge the program rules and make certain affirmative

certifications in order to be eligible to obtain the PPP loan. In the PPP loan

application, the small business (through its authorized representative) must state,

among other things, its: (a) average monthly payroll expenses; and (b) number of

employees. These figures are used to calculate the amount of money the small

business is eligible to receive under the PPP. In addition, businesses applying for a

PPP loan must provide documentation showing their payroll expenses.

8.     Among other certifications, as part of the PPP Borrower Application

Form, the Applicant must certify that "(t)he Applicant was in operation on

February 15, 2020 and had employees for whom it paid salaries and payroll taxes

or paid independent contractors, as reported on Form(s) 1099-Misc."

9.     Further, the applicant must certify and provide documents verifying

the number of employees and payroll costs and that "(t)he funds will be used to

retain workers and maintain payroll or make mortgage interest payments, lease

payments, and utility payments, as specified under the Paycheck Protection

Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as charges of fraud."

10.     In addition, the applicant must answer the question "Is the Applicant or any owner of the Applicant an owner of any other business. Or have common management with, any other business? If yes, list all such businesses and describe the relationship on a separate sheet identified as addendum A."

11.     A PPP loan application must be processed by a participating lender. If a PPP loan application is approved, the participating lender funds the PPP loan using its own monies, which are 100% guaranteed by SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA in the course of processing the loan.

12.     PPP loan proceeds must be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period of time after receiving the proceeds and uses a certain amount of the PPP loan proceeds on payroll expenses.

13.     Under the PPP, the maximum loan amount is the lesser of $10 million or an amount calculated using a payroll-based formula.  The methodology used by the applicant to calculate the maximum loan amount involves aggregating payroll costs from the last twelve months for employees whose principal place of residence is the United States and subtracting compensation paid to an employee in excess of an annual salary of $100,000.  That amount is divided by twelve to calculate the average monthly payroll costs.  The average monthly payroll costs are multiplied by 2.5.  The definition of payroll costs expressly excludes compensation of an individual employee in excess of an annual salary of $100,000.

### Overview of the Economic Injury Disaster Loan Program

14.     The EIDL program was an SBA program that provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

15.     Another source of relief provided by the CARES Act was the authorization for the SBA to provide EIDL loans of up to $2 million to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic.  Under the program, the SBA was authorized to issue advances of up to $10,000 to small businesses within three days of applying for an EIDL ("EIDL Advances").  The amount of an EIDL Advance was determined based on the

number of employees working for the applicant.  The advance did not have to be repaid.

16.     To obtain an EIDL or EIDL Advance, a qualifying business was required to submit an application to the SBA and provide information about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster and cost of goods sold in the 12-month period preceding the disaster.  In the case of EIDLs for COVID-19 relief, the 12-month period was the period preceding January 31, 2020. The applicant also was required to certify that all the information in the application was true and correct to the best of the applicant's knowledge.

17.     EIDL applications were submitted directly to the SBA and processed by the SBA with support from a government contractor, Rapid Finance.  The amount of the loan, if the application was approved, was determined based, in part, on the information provided in the application about number of employees, revenue and cost of goods, as described above.  Any funds issued under an EIDL were issued directly by the SBA.  EIDL funds could be used for payroll expenses, sick leave, production costs and business obligations, such as debts, rent and mortgage payments.  If the applicant also obtained a loan under the PPP, the EIDL funds could not be used for the same purpose as the PPP funds.

*Relevant Entities*

18.     According to records of the Hawaii Department of Commerce and Consumer Affairs ("DCCA"), MICHAEL MARCUM DIABETES CAMPAIGN INC. ("MMDC") was incorporated in the State of Hawaii on or about August 28, 2019 with KOSKI identified as the Registered Agent.  MMDC had delinquent status for the years 2020, 2021, and 2022.  On or about May 4, 2020, KOSKI submitted a PPP loan application in the name of MMDC that was approved and funded.

19.     According to records of the Washington Secretary of State ("WSOS"), WEBLOOK LLC ("WEBLOOK") was formed in the State of Washington on or about April 30, 2020, with KOSKI identified as an initial Member, the Organizer, and the Registered Agent.  WEBLOOCK was deemed inactive on or about May 1, 2021, and was administratively dissolved on or about September 3, 2021 by the WSOS.  During spring 2020, KOSKI submitted a PPP loan application and an EIDL loan application in the name of WEBLOOK that were approved and funded.

20.     According to records of the WSOS, BTC Miner Inc. ("BTCM") was incorporated on or about October 23, 2014, with KOSKI identified as the Incorporator and the Registered Agent.  BTCM was administratively dissolved on or about February 1, 2016, was reinstated on or about April 29, 2020, was deemed inactive on or about November 1, 2020, and was administratively dissolved on or

8

about March 3, 2021 by the WSOS.  During approximately spring 2020, KOSKI submitted an EIDL loan application in the name of BTCM that was approved and funded.

### *PPP Application to Harvest Small Business Finance for MMDC*

21.    At all times relevant here, Harvest Small Business Finance ("HSBF") was an approved SBA lender and participated as a lender in the PPP.

22.    According to records and information provided by HSBF and the SBA, on or about May 4, 2020, KOSKI electronically submitted to HSBF a PPP loan application in the name of MMDC seeking $285,502 in PPP funds, and identifying himself as the 100% owner. KOSKI provided a photo of his Washington State driver's license (exp. 06/04/2020) as part of the application.

23.    On the PPP application KOSKI represented that MMDC had 20 employees and an average monthly payroll of $114,201. KOSKI identified the purpose of the PPP loan as "payroll."

24.    On the PPP application, KOSKI answered "no" to the question whether the applicant has any other ownership in a business or common management with any other business. If KOSKI had answered "yes," he would have been required to list all such businesses and describe their relationships on a separate addendum. KOSKI did not do so, even though he claimed to be the owner

of another company requesting PPP funds, WEBLOOK, the details of which are described below.

25.     As additional support for the PPP application, KOSKI submitted documents purporting to be IRS Forms 941 (Employer's Quarterly Federal Tax Return) for the first, second, third, and fourth quarters of 2019 for MMDC with address 335 Merchant Street, #2481, Honolulu, HI 96813.  Each of the submitted Forms 941 bears the signature of KOSKI, and states that MMDC had 20 employees with wages totaling $342,603 for each quarter.

26.     According to the IRS, MMDC has not filed any Forms 941 or 940 (Employer's Annual Federal Unemployment Tax Return) for tax years 2019 and 2020. The Forms 941 KOSKI submitted to HSBF appear to be fabricated.

27.     On the PPP application, which contained an admonishment that making a false statement to obtain the loan is punishable by imprisonment, a fine, or both, citing 18 U.S.C. § 1001 and other statutes, KOSKI certified, among other things, that MMDC was in operation on February 15, 2020; the loan funds would be used to retain workers, maintain payroll or make mortgage interest payments, lease payments and utility payments; for the period February 15, 2020 to December 31, 2020, MMDC had not received and would not receive another PPP loan; and the information provided in the application and the information provided in all supporting documents and forms is true and accurate in all material respects.

28.     On or about May 15, 2020, as a result of the PPP application and supporting documents provided by KOSKI, the loan was approved by HSBF and the SBA.

29.     On or about May 15, 2020, HSBF wired $285,502 to the account ending in 4816 at Azlo Bank, which KOSKI had designated for receipt of the funds.

### *PPP Application to Quontic Bank for WEBLOOK*

30.     At all times relevant here, Quontic Bank was an approved SBA lender and participated as a lender in the PPP.

31.     According to records and information provided by Quontic and the SBA, on or about May 18, 2020, KOSKI electronically submitted to Quontic a PPP application in the name of WEBLOOK seeking $187,500 in PPP funds and identifying himself as the 100% owner.  The records reveal that the initial application information was submitted from IP address 66.8.136.44 at a location in Hawaii.  KOSKI provided a photo of his Washington State driver's license (exp. 06/04/2020) as part of the application.

32.     On the PPP application, KOSKI represented that WEBLOOK had 20 employees and an average monthly payroll of $75,000.  The purposes checked for this loan were "payroll."

33.    On the PPP application, KOSKI answered "no" to the question whether the applicant has any other ownership in a business or common management with any other business. If KOSKI had answered "yes," he would have been required to list all such businesses and describe their relationships on a separate addendum. KOSKI did not do so, even though he claimed to be the 100% owner of another company, MMDC, that had applied for and received just three days earlier PPP funds (as described above).

34.    As additional support for the PPP application, KOSKI submitted documents purporting to be IRS Forms 941 for the first, second, third, and fourth quarters of 2019 for WEBLOOK with address 13502 117th Ave. NE, Kirkland WA 9803.   Each of the submitted Forms 941 bears the signature of KOSKI, and states that WEBLOOK had 20 employees with wages totaling $342,603 for each quarter.

35.    According to the IRS, WEBLOOK has not filed any Forms 941 or 940 for tax years 2019 and 2020.  The Forms 941 KOSKI submitted appear to be fabricated, and contain identical payroll and tax figures to those in the Forms 941 submitted with MMDC's PPP application.

36.    On the PPP application, which contained an admonishment that a making a false statement to obtain the loan is punishable by imprisonment, a fine, or both, citing 18 U.S.C. § 1001 and other statutes, KOSKI certified, among other things, that WEBLOOK was in operation on February 15, 2020; the loan funds

would be used to retain workers, maintain payroll or make mortgage interest payments, lease payments and utility payments; for the period February 15, 2020 to December 31, 2020, WEBLOOK had not received and would not receive another PPP loan; and the information provided in the application and the information provided in all supporting documents and forms is true and accurate in all material respects.

37.     Further, KOSKI submitted with the application a bank statement  for an account ending in 4816 at Azlo Bank with an ending balance of $5,260.25 on February 29, 2020.

38.     According to records and information obtained from BBVA Bank, which is the successor to Azlo Bank, the account ending in 4816 belonged to MMDC as of February 29, 2020, and had a balance of only $2.00 on that date. Therefore, KOSKI appears to have fabricated the Azlo Bank statement to corroborate his false assertions that WEBLOOK was an operating business. Further, KOSKI's submission of the fabricated Azlo statement confirms KOSKI's ownership of both MMDC and WEBLOOK and thus the falsity of his representations on the PPP applications.

39.     On or about May 19, 2020, as a result of the PPP application and supporting documents provided by KOSKI, the loan was approved by Quontic and the SBA.

13

40.     On or about May 19, 2020, Quontic wired $187,500 to the account

ending in 4816 at BBVA/Azlo Bank maintained in the name of MMDC, which

account KOSKI had designated for receipt of the funds.

### *EIDL Application to SBA for WEBLOOK*

41.     According to records and information provided by the SBA, from on

or about April 1, 2020 to on or about June 7, 2020, KOSKI electronically

submitted to the SBA an EIDL application in the name of WEBLOOK seeking

$150,000.  KOSKI provided a photo of his Washington State driver's license (exp.

06/04/2020) as part of the application.

42.     On the EIDL application, KOSKI represented that WEBLOOK had

five employees as of January 31, 2020, and gross income of $5,500,000 for the

year ending January 31, 2020. The SBA.gov EIDL COVID-19 loan details state

the purpose of EIDL funds was working capital to make regular payments for

operating expenses, including payroll, rent/mortgage, utilities, and other ordinary

business expenses, and to pay business debt incurred at any time.

43.     According to the IRS, WEBLOOK has not filed any Forms 940 or

941 for tax years 2019 and 2020.

44.     On the EIDL application for WEBLOOK, KOSKI claimed that the

business had been in operation since January 1, 2001, and that he had owned the

business since that date. However, according to the WSOS, KOSKI formed
WEBLOOK on or about April 30, 2020.

45.     The EIDL application required the applicant to certify under penalty
of perjury that the information in the application and submitted with the
application was true and correct. Citing 18 U.S.C. § 1001 and other criminal and
civil statutes, the application also included a warning that "any false statement or
misrepresentation to SBA may result in criminal, civil, or administrative sanctions
including, but not limited to . . . fines and imprisonment, or both . . . ."

46.     According to SBA records, on or about June 7, 2020, the SBA
emailed KOSKI a Loan Authorization and Agreement for his signature. On or
about June 7, 2020, SBA received a signed copy of the agreement bearing
KOSKI's digital signature, which was submitted from IP address 66.8.136.44 at a
location in a Hawaii.

47.     The agreement states, among other things:

   a.     "Borrower will use all the proceeds of this Loan solely as
working capital to alleviate economic injury caused by disaster occurring in
the month of January 31, 2020 and continuing thereafter . . ."

   b.     "Borrower certifies that. . . "[a]ll representations in the
Borrower's Loan application (including all supplementary submissions) are
true, correct and complete and are offered to induce SBA to make this Loan.

15

c.      "[A]ny false statement or misrepresentation to SBA may result in criminal, civil or administrative sanctions, including, but not limited to . . . fines, imprisonment or both," citing 18 U.S.C. § 1001 and other criminal and civil statutes; and

d.      "[U]nder penalty of perjury of the United States of America, I hereby certify that I am authorized to apply for and obtain a disaster loan on behalf of Borrower, in connection with the effects of the COVID-19 emergency."

48.     On or about June 10, 2020, as a result of the approved EIDL loan for WEBLOOK, SBA wired $149,900 to the account ending in 4816 at BBVA/Azlo Bank maintained in the name of MMDC.

### *EIDL Application to SBA for BTCM*

49.     According to records and information provided by the SBA, from on or about May 7, 2020 to on or about June 24, 2020, KOSKI electronically submitted to the SBA an EIDL application in the name of BTCM seeking $115,000.  KOSKI provided a photo of his Washington State driver's license (exp. 06/04/2020) as part of the application.  The records reveal that the initial application information was submitted from IP address 2605:e000:110f:408d:c510:45af:679f:c4ba at a location in Hawaii.

50.    On the EIDL application, KOSKI represented that BTMC had 20 employees as of January 31, 2020, and gross income of $1,500,000 for the year ending January 31, 2020. The SBA.gov EIDL COVID-19 loan details state the purpose of the funds was working capital to make regular payments for operating expenses, including payroll, rent/mortgage, utilities, and other ordinary business expenses, and to pay business debt incurred at any time.

51.    According to the IRS, BTMC has not filed any Forms 940 or 941 for tax years 2019 and 2020.

52.    According to SBA records, on or about June 24, 2020, the SBA emailed KOSKI a Loan Authorization and Agreement for his signature. On or about June 24, 2020, SBA received a signed copy of the agreement bearing KOSKI's digital signature, which was submitted from IP address 66.8.141.7 at a location in a Hawaii.

53.    The agreement states, among other things:

a.    "Borrower will use all the proceeds of this Loan solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020 and continuing thereafter . . ."

b.    "Borrower certifies that. . . "[a]ll representations in the Borrower's Loan application (including all supplementary submissions) are true, correct and complete and are offered to induce SBA to make this Loan.

17

c.      "[A]ny false statement or misrepresentation to SBA may result

in criminal, civil or administrative sanctions, including, but not limited to . . .

fines, imprisonment or both," citing 18 U.S.C. § 1001 and other criminal and

civil statutes; and

d.      "[U]nder penalty of perjury of the United States of America, I

hereby certify that I am authorized to apply for and obtain a disaster loan on

behalf of Borrower, in connection with the effects of the COVID-19

emergency."

54.     On or about June 26, 2020, as a result of the approved SBA loan for

BTCM, SBA wired $114,900 to the account ending 4816 at BBVA/Azlo Bank

maintained in the name of MMDC.

***PPP and EIDL Loan Proceeds***

55.     A review and analysis of available bank records relating to the

investigation was conducted. The review is on-going for the following accounts:

- Bank of the Orient account ending in 8547 ("BOO 8547");
- Azlo/BBVA Bank account ending in 4816 ("BBVA 4816"); and
- First Hawaiian Bank account ending in 9059 ("FHB 9059").

56.     Initially, the loan proceeds from the PPP and EIDL loans totaling $737,802 were deposited by the lending banks and the SBA into the same account, as summarized below:

| Applicant Entity | Deposit Date | Amount | Bank Account | Lender |
|---|---|---|---|---|
| MMDC | 05/15/20 | $285,502 | MMDC's BBVA 4816 | HSBF |
| WEBLOOK | 05/19/20 | $187,500 | MMDC's BBVA 4816 | Quontic |
| WEBLOOK | 06/10/20 | $149,900 | MMDC's BBVA 4816 | SBA |
| BTCM | 06/26/20 | $114,900 | MMDC's BBVA 4816 | SBA |

57.     The loan proceeds were subsequently transferred to or through the following accounts:

| ACCOUNT HOLDER | BANK | |
|---|---|---|
| Jeremy S. Koski | First Hawaiian Bank account ending in 9059 | "FHB 9059" |
| Jeremy Stephen Koski | Bank of the Orient account ending in 8547 | "BOO 8547" |

58.     The following chart identifies transfers of more than $10,000 of the above-described fraudulently obtained PPP or EIDL proceeds from the BBVA 4816 account held in the name of MMDC to the personal accounts of KOSKI, in violation of 18 U.S.C. § 1957:

| DATE | AMOUNT | BANK ACCOUNT |
|------|--------|--------------|
| 05/15/2020 | $17,528.00 | FHB9059 |
| 05/21/2020 | $11,111.11 | BOO 8547 |
| 05/21/2020 | $22,222.22 | BOO 8547 |
| 05/21/2020 | $35,500.00 | BOO 8547 |
| 05/22/2020 | $33,333.33 | BOO 8547 |
| 06/15/2020 | $13,582.19 | FHB 9059 |
| 07/06/2020 | $37,552.16 | FHB 9059 |
| 07/06/2020 | $25,682.56 | BOO 8547 |

**OTHER INFORMATION**

59.     The address used for the PPP loan application for MMDC was 335 Merchant Street #2481, Honolulu, HI 96804. This address was also used on various financial documents belonging to KOSKI. The address is actually a post office box located at the U.S. Post Office in Honolulu, Hawaii.

60.     Records and information from the United States Postal Service reveal that Post Office Box 2481 was maintained by KOSKI from 07/27/2019 to 03/13/2020. Attached to the post office box application was a "Homeless Verification Letter" from the Institute of Human Services stating that KOSKI was residing in an "Emergency Homeless Shelter." The homeless shelter letter showed an address of 350 Sumner Street, Honolulu, Hawaii, an address used by KOSKI on various financial documents. Further review of the documents showed the post office box was opened for WEBLOOK and KOSKI with Hawaii State Identification S00154315 with expiration date 06/2024.

61.     Agents visited the address at 350 Sumner Street, Honolulu, HI 96817. The homeless shelter representative reviewed the shelter records and confirmed that KOSKI was a resident of the shelter from 12/15/2019 through 03/15/2020. The employee indicated that in order to get more information regarding KOSKI, the agents would need to contact KOSKI's case manager. The case manager was later contacted and confirmed that KOSKI was a resident of the homeless shelter from 12/14/2019 to 3/15/2020.

62.     When incorporating with the state of Washington, BTCM used a "Principal Office Street Address" of 77 S Washington St, Seattle, WA 98104. Open source intelligence shows that this address is the location of Compass Housing Alliance, a service for homeless and low-income individuals.

63.    According to the IRS, KOSKI has not filed any Forms 1040 (Annual Tax Return) for tax years 2019 and 2020.

64.    Based on my training and experience, I know that each of KOSKI's four above-described loan applications involved interstate wires transmitting loan application information over the Internet and/or wiring loan funds from the lenders to KOSKI's bank account.

## CONCLUSION

65.    Based on the forgoing, probable cause exists to believe that Jeremy KOSKI has committed Wire Fraud, in violation of 18 U.S.C. § 1343, and Money Laundering, in violation of 18 U.S.C. § 1957, in the District of Hawaii and elsewhere from in or about April 2020 to in or about July 2022.

## REQUEST FOR SEALING

66.    It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and arrest warrant.  I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation, and disclosure could lead to the destruction or concealment of evidence and the movement of the property at issue prior to execution of the seizure warrant.  Premature disclosure of the contents of this affidavit and related

documents may have a significant and negative impact on the continuing

investigation and may severely jeopardize its effectiveness.

_____
*Jasmin Gonzalez*
Jasmin Gonzalez
Special Agent
SBA-OIG

This Criminal Complaint and Affidavit in support thereof were presented to, approved by, and probable cause to believe that the defendant above-named committed the charged crime(s) found to exist by the undersigned Judicial Officer at ___9:20___ a_.m. on April 24, 2023, at Honolulu, Hawaii.

Sworn to under oath before me telephonically, and attestation acknowledged pursuant to Fed. R. Crim. P. 4.1 (b)(2), this 24th day of April, 2023, at Honolulu, Hawaii.

_____
Kenneth J. Mansfield
United States Magistrate Judge

23